### ROBERTS v. BRECKON.

(Supreme Court, Appellate Division, Fourth Department. June 18, 1898.)

1. LIBEL—PUBLICATION—PERSONS LIABLE.
    One who requests another to publish defamatory matter which he gives him, and which is published in substance as communicated, is guilty of publishing a libel.

2. SAME—SPECIAL DAMAGES—PLEADING.
    Where no special damages are pleaded in an action for libel, testimony that, as the result of the libel, plaintiff was unable to operate a factory which he had purchased, and was compelled to hire another man in his place, is inadmissible.

3. TRIAL—EVIDENCE—OBJECTIONS—WAIVER.
    Exceptions to the admission of evidence were not waived by failure to except to a charge instructing the jury to consider such evidence.

Appeal from trial term, Erie county.

Action by Leroy W. Roberts against William H. Breckon. From a judgment for plaintiff, and from an order denying a motion for a new trial, defendant appeals. Reversed.

Argued before HARDIN, P. J., and FOLLETT, ADAMS, GREEN, and WARD, JJ.

Moses Shire, for appellant.
Jeremiah Hurley, for respondent.

WARD, J. The plaintiff was a butter maker in a creamery at Clarence Center, N. Y. He had resigned his position, and was intending to move to Corry, Pa., and had packed his household goods and effects, and had billed them to Corry. The defendant was the president of this creamery. The plaintiff was indebted to the creamery when he left Clarence Center, to some extent, and the defendant sought to collect it by means of an attachment made out at Clarence Center; but he had occasion to go to Buffalo to consult counsel in the matter, and, when there, he met Mr. U. S. Braman, who was a pharmacist in Buffalo, and who had originally come from Corry, Pa., and was acquainted with the editor of the Corry Daily Leader, and with people in Corry and its vicinity. He also knew the defendant, and had been a college mate of his son, but he was not acquainted with the plaintiff. The defendant called to see Braman at his business place, and had some conversation with him. The defendant

had a roll of papers in his hand, and Braman, observing him, asked "what was upon his mind." The defendant said: "Well, we are having a little trouble out there at home with our creamery man." Braman asked what was the trouble, and the defendant said: "Well, he [plaintiff] has got his goods packed up in a car, and got them sealed up. We were a little shy, and got out some papers to hold the car until some bills had been paid out there. He owes considerable money out there. I am here to get some papers that will hold the goods. This man Roberts is a dishonest man. He is trying to get his goods away. He is going away with his goods, and he has got them billed to Corry." The defendant then said to Braman: "Do you know anybody at Corry,—that is, in the creamery business there?" Braman said, "I know Mr. Wales," and he thinks he said, "I know Mr. Pain, the editor of the daily paper there." The defendant said: "Well [speaking to Braman], Dell, these people ought to know about this. These goods are billed to Corry. I believe I would notify them, because he is a bad man." This statement came from the testimony of Braman given upon the trial. Braman further testified that having the interests of the people of Corry at heart, and without considering, he acted upon the defendant's advice, and wrote the letter, except the headlines, which constitutes the libel complained of in this action, and is as follows:

"Look Out for Him.

"Editor Leader: Having a great love for Corry and her people, I wish to take this opportunity of notifying them of a condition of affairs existing at Clarence, about twenty miles east of this city. A man by the name of Roberts [meaning the plaintiff], having been operating a creamery at that place for some time past, is about to move his entire plant, leaving the farmers who have been carting their milk to his place the past season entirely out in the cold, cheating them out of several hundred dollars. Having loaded his machinery into a car, he has billed it to Corry, Pa.; but the farmers were a little clever, and have attached his goods. I do not know as yet what the result will be. He may try to settle with a few, and get his goods over the line, in which case he will undoubtedly locate at Corry, as the car is billed there. I make this statement for the benefit of any who may be associated with the deal of bringing this man to your city, and will stand behind all I have written. Trusting these few words of warning may be of some use to you, I remain,
"Respectfully yours,	U. S. Braman."

The complaint set forth this article in full, alleged that the statement was false, and that the plaintiff had suffered great damage and injury in his business, reputation, mind, and body, and had been put to much expense and inconvenience, and his business had been completely ruined through the instrumentality of the defendant in causing the publication of the article. There were no allegations of matters of special damage. The answer of the defendant was a general denial.

The learned counsel for the appellant contends that the defendant was not liable for the publication, as he did not write it, or dictate it, or in terms request its publication, and that the conversation he had with Braman did not warrant it. We cannot assent to this contention. The statement of the defendant to Braman contained the substance of the charge as published. It contained a request, in effect, that information should be given to the public of the facts

stated in the conversation.    The defendant was the instigator of the publication,—the moving cause.    He cannot escape responsibility for its direct and legitimate effect.    Where a man makes a request to another to publish defamatory matter of which, for the purpose, he gives him a statement, whether in full or in outline, and the agent publishes that matter adhering to the sense and substance of it, although the language be to some extent his own, the man making the request is liable to an action as the publisher.    If the law were otherwise, it would in many cases throw a shield over those who are the real authors of libels, and who seek to defame others under what would then be the safe shelter of intermediate agents.    Folk. Starkie, Sland. (4th Ed.) § 539.    In Adams v. Kelly, Ryan & M. 157, a reporter prepared an article from a conversation with the defendant, and inserted it in a newspaper.    Abbott, C. J., held that what the reporter published in consequence of what passed with the defendant might be considered as published by the defendant.

But serious questions arise upon exceptions to the reception of evidence against the defendant upon the trial.    It appeared that there was a creamery at Columbus, Warren county, Pa., a village a few miles from Corry, and within the range of the circulation of the Corry Daily Leader.    The plaintiff purchased the creamery on the 11th of July, 1896, previous to the publication of the libel (which was on the 27th day of July, 1896), with a view of operating it himself. The purchase was made of Fred W. Edmunds, who was a witness for the plaintiff upon the trial.    Edmunds testified that the plaintiff was to have the possession of the creamery as soon as he could get his goods moved from Clarence Center; but he did not take possession of it, and he was asked by the plaintiff's counsel: "Why, what had happened?  Why didn't he take possession?"  The witness answered: "There was an article published."    The counsel for the defendant objected to this, upon the ground that it was incompetent and immaterial, and that the plaintiff was not entitled to recover special damages in this action if he is to recover at all.    The court said he would overrule the objection, but stated that the question might come up when the case went to the jury upon the question of damages, to which the defendant's counsel excepted.    The witness then proceeded to state that he read the libelous article on the 28th of July; that that article was the subject of conversation among the patrons of this Columbus creamery, the village people and the merchants; that at that time he had given the plaintiff a deed of the property, but not the possession; and that the witness was still operating the creamery, and making butter for the patrons of the concern; that the plaintiff had not come; and that this article published in the paper was under discussion.    Question by the plaintiff's counsel:

"Now, I ask him [the witness] what notice the patrons served upon him if this man Roberts came there to take possession, regarding their patronage of this factory?"

Then the following occurred:

"The Court: What do you claim from that, that it was communicated to the plaintiff?  Mr. Randall (Plaintiff's Counsel):  I claim that the plaintiff was unable to take possession of this factory, and go on with his work, by

reason of this article, without the loss of a majority of the patronage that went with this factory; that they simply notified Mr. Edmunds that if a man of this character came there to take charge of this factory and handle their butter— Defendant's Counsel: You are getting all of that in. I do not think it is right. The Court: No, he is not getting it in as evidence. The Defendant's Counsel: It has the effect. Mr. Randall, continuing: They would not patronize him, and gave notice to Mr. Edmunds, who was in possession, and as a result Mr. Roberts has never yet— The Court: Well, it is not claimed that they refused to deliver over possession,—perform the contract,—but a claim that this information was communicated to your client,"—to which Mr. Randall assented. "The Court: I will receive the evidence. Give you an exception [to defendant's counsel]."

The defendant's counsel then objected, on the ground that it is incompetent, and being mere hearsay, and said, "Give me an exception." The witness, continuing, said:

"They [the patrons] said that, if I had sold the property to such a man as that, they wouldn't patronize the factory, but would go to other factories near by, and they would withdraw their patronage. Several farmers told me that."

The witness was then questioned about other factories in that vicinity, and he testified as to several and their locations, under objection and the exceptions of the defendant that it was an attempt to prove special damages, and that the plaintiff was not entitled to recover special damages. The witness then, over defendant's objection and exception, said that these patrons had told him that they had read the article in the paper, and he proceeded to say that, in consequence of the attitude of these patrons, he had retained a manager of the factory until the 24th of November; that this man was kept there in the place of Mr. Roberts; that Roberts did not have charge during that time, because the witness was afraid that the patronage would go away if he did; that the man was paid $50 per month from the 11th day of July to the 24th of November, at the expense of Mr. Roberts.

The plaintiff produced Hartson S. Ayer, another witness, who resided at Columbus Borough. He was a patron of the creamery there, and frequently at the creamery, and he stated that, the article in the paper being circulated among the patrons, they came to the creamery, and talked with the witness about it. Question by plaintiff's counsel: "Q. What did they say to you about what they proposed to do with their milk if this man [plaintiff] came?" This was objected to by the defendant's counsel, upon the ground that it was incompetent and immaterial. The court overruled the objection, to which the defendant excepted. The witness then proceeded to state that the patrons informed him that he ought to tell Mr. Edmunds (the witness) to influence the plaintiff not to come there, as it would ruin the creamery; that he did so communicate to Edmunds, and advised him to prevent plaintiff from taking possession of the factory until the plaintiff either cleared himself of this stain upon him or sold the factory; that there was another creamery within three miles, a new one, and the opposition was very sharp.

Finally, the plaintiff was introduced as a witness in his own behalf, and he was asked why he did not go to Corry after the publication of the article, by his counsel. The defendant objected, upon

the ground that it was incompetent. The court overruled this objection, and the defendant excepted. The witness testified that they told him it was no use for him to come to Columbus; that he could not hold the patronage; that Edmunds was the first man that told him so, and without the patronage the creamery would be useless to him. The counsel for the defendant moved to strike out this evidence, which was refused, and the counsel for defendant excepted.

All this evidence was for the purpose of proving special damage as a result of the publication of the libelous article, viz. that the plaintiff had suffered damage on account of the attitude of the patrons of the Columbus creamery. This was clearly a special damage, that should have been alleged in the complaint. It is analogous to the damages sustained from the loss of employment or custom. The defendant must have distinct notice in the complaint of such a claim being made. Sedg. Dam. (8th Ed.) §§ 443, 1261; Abb. Tr. Ev. p. 669; Backus v. Richardson, 5 Johns. 476–485; Tobias v. Harland, 4 Wend. 537; Hallock v. Miller, 2 Barb. 630; Solms v. Lias, 16 Abb. Prac. 11; Hallock v. Belcher, 42 Barb. 199. Thus, a loss of customers is a special damage. The plaintiff cannot show the loss of any customers except such as are named. Backus v. Richardson, supra. Damages, says Mr. Chitty, "are either general or special. General damages are such as the law implies or presumes have accrued from the wrong complained of. Special damages are such as really took place and are not implied by law, and either superadded to general damages arising from an act injurious in itself, as where some particular loss arises from the uttering of slanderous words actionable in themselves, or are such as arise from an act indifferent and not actionable in itself, but injurious only in its consequences, as where words become actionable only by reason of special damage ensuing. It does not seem necessary to state the formal description of the damages in the declaration, because presumptions of law are not generally to be pleaded nor averred as facts. * * * But, when the law does not necessarily imply that the plaintiff sustained damage by the act complained of, it is essential to the validity of the declaration that the resulting damage should be shown with particularity." 1 Chit. Pl. 410, 411.

The objections taken by the counsel for the defendant to which we have referred were broad enough to reach the objection that this special damage was not alleged in the complaint. The court charged the jury, in effect, it might consider this evidence as to the special damage upon the question of damages. To this there was no exception, but we do not think that the failure to except in this regard was a waiver by the defendant of the exceptions taken by his counsel to the admission of the evidence. But the proof was in the case in spite of the defendant's objections, and the only way to relieve the case of the vice of the admission of this evidence was for the court, by a clear and distinct charge, to instruct the jury not to consider that evidence or allow special damages, and to have stricken the evidence from the case, and directed the jury to disregard it. But, waiving that question, there was so much evidence of an incompetent and of a hearsay character, admitted over the de-

fendant's objections, that was not competent to establish the special
damage claimed, or for any other purpose, but might have, and prob-
ably did, influence the jury, that the judgment and order appealed
from should be reversed, and a new trial granted, with costs to the
appellant to abide the event.   All concur.